**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
        jwilner@bursor.com
        jglatt@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALANA WATKINS, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| RISEWELL LLC, d/b/a RISEWELL, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Alana Watkins ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant RiseWell LLC, d/b/a RiseWell ("Defendant" or "RiseWell"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Plaintiff brings this class action lawsuit on behalf of herself and other similarly situated consumers who purchased Defendant's RiseWell Kids Mineral Toothpaste (the "Product").[1]

2.      As one of Defendant's Instagram advertisements correctly explains, "the mouth is a window to your overall health."[2]  To that end, the demand for toothpaste made with clean, natural ingredients has grown rapidly.  Indeed, McKinsey & Company estimated that U.S. consumers in 2022 spent more than $450 billion on wellness products and predicted that number would continue "growing at more than 5 percent annually."[3]

3.      For children's toothpaste specifically, "awareness around the importance of oral health continues to grow, [and] parents are increasingly seeking out toothpaste formulations that cater to the unique needs of their little ones."[4]  Therefore, the children's toothpaste market "thrives on innovations that ensure safety and efficacy, providing parents with peace of mind while encouraging good oral hygiene habits from an early age.[5]  Growing consumer sophistication among

---

[1] Discovery may reveal that additional of Defendant's products are within the scope of this Complaint.  Accordingly, Plaintiff reserves the right to include additional items identified through the course of discovery.

[2] RiseWell, (@risewellco), INSTAGRAM (March 18, 2024), *available* https://www.instagram.com/risewellco/.

[3] Shaun Callaghan & Warren Teichner, et al., *Still Feeling Good: The US Wellness Market Continues to Boom*, MCKINSEY & COMPANY (Sept. 19, 2022), *available* https://www.mckinsey.com/industries/consumer-packaged-goods/our-insights/still-feeling-good-the-us-wellness-market-continues-to-boom.

[4] Verified Market Reports, *Global Children Toothpaste Market by Type (Fluoride Toothpaste, Fluoride-Free Toothpaste), By Application (Online Stores, Offline Stores), by Geographic Scope And Forecast*, *available* https://www.verifiedmarketreports.com/product/children-toothpaste-market-size-and-forecast/.

[5] *Id.*

---

parents is pressuring product makers to use substances that are seen as safe and mild in addition to being effective. Defendant's brand fits squarely into that growing demand: RiseWell advertises its children's toothpaste as "natural," "safe to swallow," and absolutely chemical free for a child's safe use.

4.      Unfortunately for consumers, however, despite the brand's express safety and non-toxic ingredient claims, the Product contains (or risks containing) high levels of perfluoroalkyl and polyfluoroalkyl substances, commonly known as "PFAS." PFAS chemicals are "large, complex group[s] of synthetic chemicals" that "break down slowly, if at all."[6] Because PFAS chemicals do not break down quickly, if at all, these chemicals can build up in the body after repeated exposure and have been linked to "increased cholesterol, changes in the body's hormones and immune system, decreased fertility, and increased risk of certain cancers."[7]

5.      Alarmingly, three tests of three different lots of Defendant's Product conducted at a Department of Defense ELAP-certified laboratory, found PFAS chemicals present in the Product. The first lot tested contained 188.27 parts per billion of PFAS chemicals. The second lot tested contained 319.1 parts per billion of PFAS chemicals. The third lot tested contained 970 parts per trillion of PFAS chemicals.

6.      For reference, when researchers found 250 parts per trillion PFAS in kale—over 753, 1,276.4, and 3.75 times *less* than what was found in each respective lot—they described being "stunned" by the "high levels" of the compounds.[8]

---

[6] Nat'l Inst. of Env. Health Sciences, *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, U.S. DEP'T. OF HEALTH AND HUM. SERVS., *available* https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm.

[7] Michigan PFAS Action Response Team, *EGLE Classroom: Introduction to PFAS*, *available* https://www.michigan.gov/pfasresponse/faq/categories/pfas-101.

[8] *See* Tom Perkins, *New Report Finds Most US Kale Samples Contain 'Disturbing' Levels of 'Forever Chemicals,'* THE GUARDIAN (June 30, 2023), *available* https://www.theguardian.com/environment/2023/jun/30/kale-pfas-forever-chemicals-contamination.

7.      What's more, "EPA is setting enforceable Maximum Contaminant Levels at 4.0 parts per trillion for" specific PFAS compounds.[9]  The lots tested contained *over* 47,000, 79,775, and 242.5 times this amount, respectively.

8.      Accordingly, Plaintiff brings her claims against Defendant individually and on behalf of classes of all others similarly situated for (1) violation of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*; (2) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (3) violation of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (4) Breach of Express Warranty; and (5) Unjust Enrichment.

## PARTIES

9.      Plaintiff Alana Watkins is a citizen of California who resides in Santa Cruz, California.  As recently as December 2023, Plaintiff purchased Defendant's Kids Mineral Toothpaste for her children from Defendant's website from her home in Santa Cruz, California. Prior to her purchase, Plaintiff reviewed the Product's marketing, Defendant's online advertising, health claims, ingredient and Product composition claims, and understood those representations and warranties to mean that the Product was completely free of harmful toxins and safe for her children to use.  Plaintiff purchased the Product because it was advertised as a natural, completely toxin-free toothpaste alternative that is safe to swallow.  Plaintiff would not have purchased it, or would not have made the purchase on the same terms, had she known that the Product contained (or risked containing) toxic PFAS chemicals.

10.     Plaintiff remains interested in purchasing a natural toothpaste from Defendant that is safe for her child to use.  However, she is unable to determine if the Product is actually safe or if it contains (or risks containing) synthetic, toxic, PFAS chemicals.  As long as the Product is marketed as being "the only [toothpaste] on the market" that is "safe to swallow," "naturally effective," and "100% safe and natural" when it contains (or risks containing) harmful PFAS chemicals, Plaintiff will be unable to make informed decisions about whether to purchase Defendant's Product and will

---

[9] *Biden-Harris Administration Finalizes First-Ever National Drinking Water Standard to Protect 100M People From PFAS Pollution*, EPA (Apr. 10, 2024), *available* https://www.epa.gov/newsreleases/biden-harris-administration-finalizes-first-ever-national-drinking-water-standard.

1    be unable to evaluate the different prices between Defendant's Product and competitors' products.

2    She is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is

3    compelled to ensure that its marketing is accurate, non-misleading, and its Product is actually

4    toxin-free.  Plaintiff would like to purchase the Product again in the future.  Had she known the

5    true nature of the Product, Plaintiff would have paid substantially less for it, if anything at all.

6         11.    Defendant RiseWell LLC is a New York Limited Liability Company with its

7    principal place of business at 82 Beaver Street, New York, NY 10005.  Defendant RiseWell

8    produces, manufactures, markets, and sells toothpaste, including the Product, throughout California

9    and the United States.

10                            **JURISDICTION AND VENUE**

11        12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as

12   modified by the Class Action Fairness Act ("CAFA"), because at least one member of the Class is

13   a citizen of a different state than Defendant, there are more than 100 members of the Class, and the

14   aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

15        13.    This Court has personal jurisdiction over Defendant because Defendant conducts

16   substantial business within California, including in this District, and purposefully avails itself to the

17   benefits of this District.  In addition, a substantial portion of the events giving rise to Plaintiff's

18   claims occurred in this District.

19        14.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial portion

20   of the events, omission, and acts giving rise to the claims herein occurred in this District.

21                            **FACTUAL ALLEGATIONS**

22   I.    **Exposure To PFAS Chemicals.**

23        15.    "PFAS are man-made chemicals that have been used in industry and consumer

24   products worldwide since the 1940s.  They have been used to make nonstick cookware, water-

25

26

27

28

repellent clothing, stain resistant fabrics and carpets, some cosmetics, some firefighting foams, and products that resist grease, water, and oil."[10]

16.     PFAS are large, complex groups of synthetic chemicals that break down slowly, if at all, and as such can accumulate in the body once someone has ingested them.[11]  PFAS exposure can occur by using products made with PFAS or products that are packaged in materials containing PFAS, among others.[12]  PFAS chemicals have also been found in water supplies.[13]  PFAS have been linked to "increased cholesterol, changes in the body's hormones and immune system, decreased fertility, and increased risk of cancers."[14]

17.     Indeed, in 2021, the Biden Administration, taking on "accelerated efforts to protect Americans from per- and polyfluoroalkyl substances (PFAS), which can cause severe health problems and persists in the environment once released, posing a serious threat across rural, suburban, and urban areas," announced an agency plan to "prevent PFAS from being released into the air, drinking systems, and [the] food supply … to remediate the impact of these harmful pollutants."[15]  Taking action to protect people from PFAS exposure, in April 2024, the White House announced a plan to create "the first-ever national legally enforceable drinking water

---

[10] Agency for Toxic Substances and Disease Registry, *What are PFAS?* U.S. DEP'T OF HEALTH & HUM. SERVS. (Jan. 18, 2024), *available* https://www.atsdr.cdc.gov/pfas/health-effects/overview.html.

[11] Nat'l Inst. of Env. Health Sciences, *supra* note 6.

[12] EPA, *Our Current Understanding of the Human Health and Environmental Risks of PFAS* (June 7, 2023), *available* https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-Risks-pfas#:~:text=Current%20research%20has%20shown%20that,may%20contain%20PFAS%2C%20including%20fish.

[13] *Fact Sheet: Biden-Harris Administration Takes Critical Action to Protect Communities from PFAS Pollution in Drinking Water*, The White House (April 10, 2024), *available* https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/10/fact-sheet-biden-harris-administration-takes-critical-action-to-protect-communities-from-pfas-pollution-in-drinking-water/.

[14] Michigan PFAS Action Response Team, *supra* note 7.

[15] *Fact Sheet: Biden-Harris Administration Launches Plan to Combat PFAS Pollution*, The White House (Oct. 18, 2021), *available* https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/18/fact-sheet-biden-harris-administration-launches-plan-to-combat-pfas-pollution/.

---

standard for PFAS, which will protect 100 million people from PFAS exposure, prevent tens of thousands of serious illnesses, and save lives."[16]

18.     Likewise, "[p]rior studies have shown that PFAS in food packaging can leach into food and higher levels of PFAS have been found in blood testing of people who regularly eat types of foods that are typically sold in PFAS-containing packaging."[17]

19.     The level of risk presented by PFAS chemical exposure varies depending on the recipient.  In children, PFAS have been linked to "[l]ower antibody response[s] to some vaccines,"[18] thereby rendering children more vulnerable to diseases they were otherwise immunized from.  In fact, the American Academy of Pediatrics has found that "[c]hildren are more vulnerable to environmental pollutants like PFAS than adults because of … lower body weight, differences in water and food intake, developing organ systems and longer lifespans during which toxic effects might manifest."[19]  Accordingly, the presence of PFAS in children's toothpaste, like Defendant's, is particularly alarming.  But, regardless of a person's stage in life, "[v]irtually no amount of PFAS is safe for consumption, according to the U.S. Environmental Protection Agency."[20]

---

[16] *Fact Sheet: Biden-Harris Administration Takes Critical Action to Protect Communities from PFAS Pollution in Drinking Water*, The White House (April 10, 2024), *available* https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/10/fact-sheet-biden-harris-administration-takes-critical-action-to-protect-communities-from-pfas-pollution-in-drinking-water/.

[17] Int'l Pollutants Elimination Network, *McDonald's, KFC, Burger King, Subway, Starbucks, Dunkin' Donuts, and Jolly Time Found to Have Inconsistent use of PFAS and PFAS-Free Packaging,* IPEN FOR A TOXICS-FREE FUTURE (Dec. 13, 2023), *available* https://ipen.org/news/single-use-food-packaging-17-countries-contains-pfas-%E2%80%9Cforever-chemicals%E2%80%9D#:~:text=Prior%20studies%20have%20shown%20that,sold%20in%20PFAS%2Dcontaining%20packaging.

[18] Agency for Toxic Substances and Disease Registry, *What are the health effects of PFAS?* U.S. DEP'T OF HEALTH & HUM. SERVS. (Jan. 18, 2024), *available* https://www.atsdr.cdc.gov/pfas/health-effects/overview.html.

[19] Alan D. Woolf, M.D., M.P.H., FAAP, & Lauren Zajac, M.D., M.P.H., FAAP., *Report Outlines Health Effects of PFAS Chemicals in Children, Provides Recommendations for Testing*, AM. ACAD. OF PEDIATRICS (Sept. 13, 2022), *available* https://publications.aap.org/aapnews/news/22138/Report-outlines-health-effects-of-PFAS-chemicals?autologincheck=redirected.

[20] Wisconsin Watch, *What Should I do about PFAS in my Water?* PBS Wisconsin (Nov. 28, 2022), *available* https://pbswisconsin.org/news-item/what-should-i-do-about-pfas-in-my-water/#:~:text=How%20much%20PFAS%20is%20harmful,the%20U.S.%20Environmental%20Protection%20Agency.

---

20.     Toothpaste is a particularly effective method of introducing PFAS substances into the body.  The mouth and oral lining tissue are efficient entry points.  Specifically, oral absorption occurs either via the oral mucosa, which is the mucous membrane lining the "skin" inside the mouth, including the cheeks and lips,[21] or through the sublingual mucosa, which refers to the tongue and the floor of the mouth.[22]  Both areas efficiently usher particulates into the bloodstream.[23]  This is because, in the case of absorption through oral mucosa, "[t]here are tiny blood vessels in the cheek area, allowing [] [substances] to be absorbed directly into the bloodstream, bypassing the digestive system."[24]  Similarly, particulates introduced to the sublingual mucosa are absorbed "directly in to the blood stream through the ventral surface of the tongue and floor of the mouth … [allowing] rapid absorp[tion]" into the system of facial veins that connects to the rest of the body's systemic circulation.[25]  In fact, "[t]he absorption of [a] drug through the sublingual route is 3 to 10 times greater than [the] oral route and is only surpassed by hypodermic injection."[26]  Thus, the presence of PFAS in toothpaste poses a particular danger to users because of the body's efficiency in oral absorption.

21.     As a result, there is a growing consumer demand to eliminate PFAS from various consumer products, including oral hygiene products.[27]

---

[21] Dep't. of Dermatology, *Oral Mucosal Diseases*, UNIV. OF CAL., DAVIS, *available* https://health.ucdavis.edu/dermatology/specialties/medical/oral.html.

[22] Neha Narang & Jyoti Sharma, *Sublingual Mucosa As a Route for Systemic Drug Delivery*, 3 (2) INT'L J. PHARMACY & PHARM. SCI. 18-22, 18 (2011) *available* https://innovareacademics.in/journal/ijpps/Vol3Suppl2/1092.pdf.

[23] *What is Buccal & Sublingual Absorption and Why Are They So Important?* Avior Nutritionals (May 16, 2019), *available* https://www.aviornutritionals.com/what-is-buccal-sublingual-absorption-and-why-are-they-so-important/.

[24] *Id.*

[25] Narang & Sharma, *supra* note 22.

[26] *Id.*

[27] Elicia Mayuri Cousins, et al., *Risky Business? Manufacturer and Retailer Action to Remove Per- and Polyfluorinated Chemicals from Consumer Products*, NEW SOLUTIONS: J. OF ENV'T & OCCUPATIONAL HEALTH POL'Y (2019) 29(2), 242-65, doi: 10.1177/104829111985674.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**II.**     **Defendant's Representations Are Actionable**

> **A.**     **Defendant Uses Its Website to Make Express, But False And Misleading, Health and Safety Claims About its Product.**

22.     As noted in paragraph 5, *supra*, testing of three lots of Defendant's Product found 188.27 parts per billion of PFAS chemicals, 319.1 parts per billion of PFAS chemicals, and 970 parts per trillion of PFAS chemicals respectively, indicating a high likelihood that toxic PFAS chemicals are present (or risk being present) throughout Defendant's purportedly toxin-free Product.

23.     These results are contrary to the warranties and representations made throughout Defendant's marketing.  Defendant's material omissions therefore harmed Plaintiff.

24.     For example, Defendant expressly warrants that the Product is "100% safe to swallow" on the checkout page on its website.[28, 29]



---

[28] *Kids Mineral Toothpaste*, RiseWell, *available* https://risewell.com/products/risewell-kids-toothpaste.

[29] This screenshot is current as of June 2024.  Defendant has since updated its page which is substantially the same as the image produced.  Defendant is best situated to know how long it was on the website and when it was removed.

---

25.     Defendant bookends its "safe to swallow" claim by explaining on the Product's page that it is "naturally effective" and relies on "a naturally occurring mineral," while assuring consumers like Plaintiff that there's "no need to be nervous when your little ones begin learning to brush!"[30]

26.     Doubling down on the "safe to swallow claim, Defendant explains that "since the rest of our ingredients are also **all** safe, you have nothing to worry about when using our natural fluoride-free toothpaste, morning, noon, or night."[31]

27.     Defendant has since changed its website to slightly alter its language.  For instance, Defendant's website now explains that "*HA* is so safe you can eat it" (emphasis added), however, the language as it appears in the image below appeared on Defendant's website as late as June 2024.  Defendant is best situated to know how long it appeared on the website and when it was removed.



So **safe** you can eat it

...but that might be weird

Because Hydroxyapatite is a naturally occurring mineral in our teeth and bones, it's completely harmless if accidentally ingested. And since the rest of our ingredients are also all safe, you have nothing to worry about when using our natural fluoride-free toothpaste, morning, noon, or night.

28.     Defendant, as a leading manufacturer, marketer, and seller of children's toothpaste, knows the value of ensuring that a toothpaste brand specifically intended for children is safe to swallow.  In fact, it is fairly common—if not expected—that children will swallow toothpaste. One study of a "sample size comprised [of] 75 parents of children between the age group of 3 and 5 years" found that "83% of the children have the habit of toothpaste swallowing."[32]

---

[30] RiseWell, *supra* note 28.

[31] RiseWell, *Backed by Science to Conquer Cavities Naturally*, *available* https://risewell.com/pages/science (emphasis added).

[32] B. Aishwarya Reddy, et al., *Prevalence of Toothpaste Swallowing Habit in Children Between the Age Group of 3 and 5 Years*, Drug Intervention Today 12(7) (March 2019) 1452-1455, *available*

29.     Accordingly, Defendant charges a premium for its Product.  In 2023, the average price for a tube of toothpaste was $3.92.[33]  Defendant, however, charges either $12.00 per tube for a one-time purchase or $10.20 for consumers with recurring order subscriptions.  Defendant justifies the high price premium by distinguishing its toothpaste from competitors' brands based on health, safety, ingredient quality, and transparency claims.  For example, Defendant refers to the Product as having "extra special benefits" for children and offers the "safest" ingredients[34]:



30.     And if that was not enough, Defendant publishes a grid, capturing what it calls "The RiseWell Difference," directly comparing the Product to "natural" and "traditional" competitors. Among the attributes Defendant promotes to set its Product apart are "[i]ngredients you can pronounce" that are "[n]aturally effective ingredients," culminating in a children's toothpaste that

https://www.researchgate.net/publication/335523804_Prevalence_of_toothpaste_swallowing_habit_in_children_between_the_age_group_of_3_and_5_years.

[33] The Council for Community and Economic Research, *Just a Tube of Toothpaste or a Teller of Tumultuous Times? available* https://www.coli.org/just-a-tube-of-toothpaste-or-a-teller-of-tumultuous-times/#:~:text=According%20to%20the%20most%20recent,to%20%243.92%20in%20Q3%202023.

[34] RiseWell, *supra* note 28.

is "[s]afe enough to eat."[35]  Most concerningly, Defendant falsely assures parents, like Plaintiff, that, "[u]nlike many natural toothpastes, **we don't just remove the toxic ingredients found in traditional toothpastes; we swap in 100% safe, natural alternatives** that clean and protect just as effectively."[36]



31.    Defendant relies heavily on its safety representations and attempts to make its claims credible to consumers by promising that its labeling practices are more trustworthy than competitors' labeling practices.  Defendant ironically notes that "[t]he lack of regulation within the cosmetic industry permits the use of harmful ingredients, making it easy for many companies to hide behind labels like 'natural ingredients[.]'"[37]  Defendant misleadingly assures consumers instead that, unlike competitors, RiseWell "let[s] you know **every ingredient** in all of [its]

---

[35] RiseWell, *supra* note 28.

[36] RiseWell, *supra* note 31 (emphasis added).

[37] *Id*.

products.  Period."[38]  Unfortunately for Plaintiff, this promise does not include disclosing high

levels (or the risk thereof) of toxic PFAS chemicals.

32.    RiseWell's physical packaging does not fare much better.  Both the external box and

the tube represent and warrant that the toothpaste is "Naturally whitening," and contains "Only

Good Stuff."



33.    The back of the tube also makes false and misleading guarantees.  The marketing on

the back of the tube warrants that "RiseWell Kids Toothpaste is like no other natural toothpaste out

there. … Our goal is to give your kids a toothpaste that is as effective as chemical toothpastes, **but**

---

[38] *Id.*

**without the toxins.**  So[,] instead of simply eliminating these chemicals, **we found replacements that are not only natural and completely safe but also incredibly effective.**"



34.     Defendant's health representations track with marketing trends for children's toothpaste.  This is because of the unique market position that the massive children's toothpaste segment holds.  Accordingly, Defendant's material omissions harmed Plaintiff.  Defendant, as a major manufacturer, marketer, and seller in this space, more than likely understands the market trends and consumer preferences in this space and calibrates its marketing and advertising accordingly.

**B.     Defendant Makes Similar Representations Throughout RiseWell's Online Presence**

35.     Defendant reiterates the claims on its website throughout its online marketing and third-party website points of sale.  On its Amazon page, RiseWell assures parents that they can "[r]est easy knowing that our hydroxyapatite toothpaste for kids is 100% safe to swallow and eat.

This … offers peace of mind for parents and a worry-free brushing experience for their little ones."[39]  RiseWell also assures parents that they can "[s]ay goodbye to artificial colors, flavors, and preservatives with our natural kids toothpaste [that is] safe to swallow, providing a pure and natural option for your child's dental hygiene needs."[40]

36.   RiseWell repeats these similar claims on the Walmart sales page for the Product.  The Product details explain that "[d]aily usage will leave your kid's teeth visibly whiter, healthier, and stronger as their smiles grow and mature.  And the best part? It's safe enough to eat—even if your kids … eat the whole delicious tube!"[41]

37.   RiseWell's health and safety representations are not limited to its website and third-party sales pages.  RiseWell's Facebook marketing echoes the same claims made on its website, advertising online and packaging.  As such, its 100% safe and clean, safe-to-swallow, and chemical free marketing is uniform and pervasive.



---

[39] *RiseWell Kids Mineral Toothpaste – Kids Hydroxyapatite Toothpaste – Safe to Swallow – Natural Fluoride Free Toothpaste for Kids – Cake Batter, 3.4 Oz.*, Amazon.com, *available* https://www.amazon.com/Risewell-Kids-Batter-Hydroxyapatite-Toothpaste/dp/B0B249Q6MF.

[40] *Id.*

[41] *Risewell Kids Cake Batter Hydroxyapatite Toothpaste*, Walmart.com, *available* https://www.walmart.com/ip/Risewell-Kids-Cake-Batter-Hydroxyapatite-Toothpaste/2285120002?from=/search.

38.     Similarly, RiseWell's own Instagram and TikTok posts are intended to convey to consumers that the brand is in lockstep with its health-conscious consumers who are in the market for a purported "non-toxic" natural, oral health product.

 

39.     But, despite RiseWell's repeated, affirmative claims that the Product is 100% safe to swallow and only contains clean, safe ingredients, Defendant omits the fact that the Product contains (or risks containing) high levels of toxic PFAS chemicals, which are efficiently absorbed into the body orally.

40.     However, Plaintiff and the members of the Classes bargained for a product that is made from clean ingredients and completely free of—or free of the risk of containing—harmful toxic chemicals, and were thus deprived of the basis of their bargain when Defendant sold them a Product Defendant both affirmatively represented as meeting those desires and that Defendant offers as a contrast from competing "natural" and traditional toothpaste products.  RiseWell elected to engage in this marketing despite the Product containing—or risk containing—high levels of toxic PFAS chemicals, thereby exposing (or risk exposing) consumers and their children to various health risks that they sought to avoid by buying the Product.

41.    No reasonable consumer would expect the Product, which was affirmatively warranted as being safe to swallow, completely natural, and "100%" toxic-free to contain (or risk containing) harmful PFAS chemicals.

42.    In addition, because Defendant affirmatively and expressly represented its Product as "clean, safe, and natural" and "100% safe to swallow," Defendant misdescribed specific and absolute characteristics about the Product.  Defendant made affirmative, absolute representations and warranties that the Product was completely free of harmful chemicals.  For this reason, Defendant had a duty to disclose the presence (or risk thereof) of toxic, harmful, PFAS chemicals.

43.    Thus, Defendant was under a continuous duty to disclose to Plaintiff and the members of the Classes the true standard, quality, and grade of the Product, and to disclose that the Product contained substances known to have adverse health effects.  Defendant also had a duty to disclose because of its exclusive and/or superior knowledge concerning the true nature and composition of the Product as the owner, manufacturer, producer, marketer, and seller of the Product.  Nonetheless, Defendant concealed this material information and affirmatively warranted the opposite.

44.    In addition, Defendant's representations that the Product is "clean, safe, and natural," and "100% safe to swallow," by virtue of having "remove[d] the toxic ingredients found in traditional toothpastes," are misdescriptions of specific characteristics of the Product.

45.    Moreover, given the randomized samples that were tested on three separate occasions, it is likely that dangerous PFAS chemicals are present in the Product generally, not simply the Product lots tested.

46.    Although Defendant is in the best and exclusive position to know the true composition and contents of its Product, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

a)  **WHO:** Defendant RiseWell LLC, doing business as RiseWell.

b)  **WHAT:** Defendant's conduct here was, and continues to be, fraudulent because it omitted and concealed that the Product contained (or risked containing) PFAS— which are widely known to have significant negative health repercussions, are not

natural, and are toxic.  Thus, Defendant's conduct deceived Plaintiff and the members of the Classes into believing that the Product is wholly natural, absolutely toxin-free, and thus safe to swallow when it is not.  As demonstrated by Defendant's intense focus on positioning itself as a toxin-free, natural, safe-to-swallow brand and directly comparing and contrasting those qualities to competitor brands, Defendant knew or reasonably should have known, that this information is material to reasonable consumers, including Plaintiff and the members of the Classes when they make their purchasing decisions.  Despite this, Defendant continued to pervasively and affirmatively warrant and represent that the Product was of a clean, natural, completely toxic-free quality and character when it is not.

c) **WHEN:** Defendant made material representations and omissions during the putative class periods, including prior to and at the time of Plaintiff's and the Class Members' purchases.  Plaintiff viewed the packaging and advertising of the Product online at purchase and viewed the representations and warranties made by Defendant, understanding them to mean precisely what they say—that the Product is a uniquely safe, totally natural, absolutely toxin-free, safe-to-swallow toothpaste fit for safe use by children.

d) **WHERE:** Defendant's marketing messages were uniform and pervasive throughout California and the United States and carried throughout material misrepresentations, warranties, and omissions on its labeling, packaging, and marketing materials.

e) **HOW:** Defendant made material misrepresentations and omissions of fact regarding the Product by representing and warranting that the Product was made of only natural ingredients and that it is therefore completely toxin-free and safe to swallow when the Product actually contained (or risked containing) high levels of harmful, toxic PFAS chemicals.

f) **WHY IT IS FALSE:** Defendant made material representations and warranties that its Product is an "100% safe to swallow," toxin-free children's toothpaste comprised of only natural ingredients.  In addition, Defendant compares its Product and the

Product's composition to that of competitors to demonstrate to consumers that the brand and Product are uniquely positioned as more honest about its ingredients, which it represents as safe, natural and toxin-free. However, the Product contains (or risks containing) high levels of toxic, unsafe, unnatural PFAS chemicals, which is contrary to RiseWell's affirmative representations and warranties.

g) **INJURY:** Plaintiff and the members of the Classes purchased, and paid a premium, or otherwise paid more for the Product they otherwise would not have had they known the truth of Defendant's Product and had not reasonably relied on its representations and warranties.

## CLASS ALLEGATIONS

47.     Plaintiff brings this matter on behalf of herself, and all similarly situated in the following Classes (collectively, the "Classes"):

> *Nationwide Class.*  All natural persons in the United States who purchased the Product, and all substantially similar products, from October 25, 2020, to present.

48.     Plaintiff also seeks to represent the following Subclass:

> *California Subclass.*  All natural persons in the State of California who purchased the Product, and all substantially similar products, from October 25, 2020, to present.

49.     Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent have a controlling interest and its current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendant's counsel.

50.     **Numerosity.**  Class Members are so numerous that joinder of all members is impracticable.  Plaintiff believes that there are thousands of people who purchased the Product and substantially similar versions of the Product who have been injured by Defendant's false and misleading representations.  While the exact number of members of each Class is unknown to Plaintiff at this time, such information can be ascertained through appropriate discovery from records maintained by Defendant and its agents.

51.     **Commonality and Predominance.**  The questions of law and fact common to the Classes, which predominate over any questions that may affect individual class members include, but are not limited to:

    i.   Whether Defendant's Product contains PFAS;

    ii.   Whether Defendant represented and warranted that the Product was natural, safe to swallow, and toxin-free;

    iii.   Whether Defendant breached those representations and warranties;

    iv.   Whether Plaintiff and the members of the Classes reasonably relied on Defendant's representations, warranties, and omissions;

    v.   Whether Defendant's conduct violated California's consumer protection statutes;

    vi.   Whether Defendant's conduct amounted to violations of the common law; and

    vii.   Whether the knowledge of the presence (or risk thereof) of PFAS in the Product would be material to a reasonable consumer.

52.     **Typicality.**  The claims of the named Plaintiff are typical of the claims of the members of the Classes because the named Plaintiff, like other members of the Classes, purchased the Product and Defendant's substantially similar products, relying on the representations and warranties made by Defendant online and on its product packaging, that the Product was safe for children to use, because it is absolutely free of harmful toxins.

53.     **Adequate Representation.**  Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation. Plaintiff and her counsel are committed to vigorously prosecuting this class action.  Neither Plaintiff, nor her counsel, have any interest adverse to, or in conflict with, the interests of the absent members of the Classes.  Plaintiff is able to fairly and adequately represent the interest of the Classes.  Plaintiff has raised viable statutory claims of the type reasonably expected to be raised by members of the Classes and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this complaint to include additional Class Representatives to represent the Classes or additional claims as may be appropriate.

54.    **Superiority.**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable.  Even if every member of the Classes could afford to pursue individual litigation, the Court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system, resulting in multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents fewer management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes.  Plaintiff anticipates no difficulty in the management of this action as a class action.  Class-wide relief is essential to compel compliance with California's consumer protection laws.

## CAUSES OF ACTION

### COUNT I
**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**California Civil Code §§ 1750, *et seq.***
**(On Behalf of the California Subclass)**

55.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

56.    Plaintiff brings this claim individually and on behalf of the California Subclass.

57.    Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have…."

58.    Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

59.    Civil Code § 1770(a)(9) prohibits "advertising goods … with intent not to sell them as advertised."

60.    Defendant violated Civil Code §§1770(a)(5), (a)(7), and (a)(9) by holding out the Product as being made from ***only*** natural and safe ingredients, such that it is safe enough to

1    swallow, when, in fact, the Product contained (or risked containing) high amounts of unsafe,

2    unnatural, toxic PFAS chemicals.

3          61.    Defendant made its representations to Plaintiff and the members of the California

4    Subclass while suppressing the true nature of the Product.  Specifically, Defendant displayed the

5    Product and described it as wholly comprised of only clean, natural ingredients and therefore safe

6    to swallow, including on the Product's packaging, on its website, and in its marketing, without

7    disclosing that the Product contains (or risks containing) toxic PFAS chemicals.  As such,

8    Defendant affirmatively misrepresented, *inter alia*, the ingredients, quality, and grade of the

9    Product while continuing to advertise the goods without the intent to sell them as advertised.

10         62.    Plaintiff and the California Subclass suffered harm as a result of the violations of the

11   CLRA because they incurred, charged, and/or paid monies for the Product that they otherwise

12   would not have incurred or paid and were unknowingly exposed to a significant and substantial

13   health risk.

14         63.    On April 23, 2024, prior to filing this complaint, Defendant's Counsel accepted

15   service of Plaintiff's demand letter via email.  The letter advised Defendant that it was in violation

16   of the CLRA with respect to the presence of PFAS in the Product, and demanded that they cease

17   and desist from such violations and make full restitution by refunding the monies received

18   therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers.

19         64.    Defendant failed to remedy the issues raised by the notice letter.

20         65.    Pursuant to Civ. Code § 1780, Plaintiff and the California Subclass seek: (a) actual

21   damages in an amount to be determined at trial; (b) an order enjoining Defendant from continuing

22   its violative acts and practices; (c) restitution of all money and property lost by Plaintiff and the

23   Subclass as a result of Defendant's unlawful conduct; (d) punitive damages; (e) any other relief

24   that the Court deems proper; and (f) attorneys' costs and fees.

25                                    **COUNT II**
                          **Violation of California's Unfair Competition Law,**
26                         **Cal. Bus. & Prof. Code §§ 17200, *et seq.***
                              **(On Behalf of the California Subclass)**
27
           66.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.
28

67.     Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

68.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210 by engaging in unlawful, unfair, and fraudulent conduct.

69.     Defendant violated the UCL's proscription against engaging in **Unlawful Business Practices** by violating the CLRA, Cal. Civ. Code §§ 1770(a)(5), (a)(7), and (a)(9), as well as by violating California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*

70.     As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of its Product is likely to deceive reasonable consumers.  In addition, Defendant has committed unlawful business practices by, *inter alia*, making the representations and omissions of material facts, as set forth more fully above, thereby violating the common law.

71.     Plaintiff and the Classes reserve the right to allege other violations of law, which constitute other unlawful business acts or practices.

72.     Defendant also violated the UCL's prohibition against engaging in **Unfair Business Practices.**  Defendant's acts, omissions, misrepresentations, practices, and non-disclosures as alleged herein also constituted "unfair" business acts and practices within the meaning of Bus. & Prof. Code §§ 17200, *et. seq.*, as the conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

73.     There were reasonably available alternatives to further Defendant's legitimate business interest other than the conduct described above.  There are no legitimate business purposes served by Defendant's conduct, which caused Plaintiff and the California Subclass economic injury because they purchased a Product, the basis of the bargain for which was untrue.

74.     Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices.**  Defendant's claims, nondisclosures, and misleading statements

1    with respect to the Product, as more fully set forth above, were false, misleading, and/or likely to

2    deceive the consuming public within the meaning of Bus. & Prof. Code § 17200.

3         75.    Plaintiff and the Classes suffered a substantial injury by virtue of buying the

4    Product that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair

5    marketing, advertising, packaging, and omission about the inclusion of harmful toxins in its

6    Product.

7         76.    There is no benefit to consumers or competition from deceptively marketing and

8    omitting material facts about the true nature of the Product.

9         77.    Plaintiff and the Classes had no way of reasonably knowing that the Product they

10   purchased was not truthfully marketed, advertised, packaged, or labeled.  Thus, they could not have

11   reasonably avoided the injury each of them suffered.

12        78.    The gravity of the consequences of Defendant's conduct as described outweighs any

13   justification, motive, or reason therefore, particularly considering the available legal alternatives

14   that exist in the marketplace.  Such conduct is immoral, unethical, unscrupulous, offends

15   established public policy, or is substantially injurious to Plaintiff and the other members of the

16   Classes.

17        79.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and the Subclass seek an order

18   of this Court that includes, but is not limited to, requiring Defendant to (a) provide restitution to

19   Plaintiff and other California Subclass Members; (b) disgorge all revenues obtained as a result of

20   violations of the UCL; and (c) pay Plaintiff's attorneys' fees and costs.

**COUNT III**
**Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(On Behalf of the California Subclass)**

24        80.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

25        81.    Plaintiff brings this claim on behalf of herself and the California Subclass against

26   Defendant.

82.     Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive, members of the California Subclass and public.  As described throughout this Complaint, Defendant misrepresented the Product as wholly natural, free from toxic chemicals, and therefore safe to swallow when, in fact, the Product is (or risks being) not wholly natural, free from toxic chemicals, or safe to swallow because of the inclusion of PFAS chemicals.

83.     By its actions, Defendant disseminated uniform advertising regarding the Product across California and the U.S.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code §§ 17500, *et seq.*  Such advertisements were intended to and likely did deceive the consuming public.

84.     The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the Product contains (or risks containing) substances that pose a significant risk to the health of consumers and failed to correct its advertising.

85.     Defendant continues to misrepresent to consumers that the Product is safe to swallow, wholly natural, and absolutely toxin-free when, in fact, the Product is not or risks being not.

86.     In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law.  Plaintiff and members of the California Subclass based their purchasing decisions on Defendant's omitted material facts.  The revenue attributable to the Product sold in those false and misleading advertisements likely amounts to millions of dollars.  Plaintiff and members of the California Subclass were injured in fact and lost money and property as a result.

87.     The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code §§ 17500, *et. seq.*

88.     As a result of Defendant's wrongful conduct, Plaintiff and members of the California Subclass lost money in an amount to be proven at trial.  Plaintiff and the Subclass are therefore entitled to restitution as appropriate for this cause of action.

89.     Plaintiff and the California Subclass seek all monetary and non-monetary relief allowed by law, including (a) restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; (b) declaratory relief; (c) reasonable attorneys' fees and costs under California Code Civ. Proc. § 1021.5; and (e) injunctive relief, and other appropriate equitable relief.

## COUNT IV
### Breach of Express Warranty
### (On Behalf of the Nationwide Class)

90.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

91.     Plaintiff brings this claim individually on behalf of herself and the Nationwide Class.

92.     Plaintiff brings this claim under the laws of the State of California.

93.     Plaintiff and Nationwide Class Members formed a contract with Defendant at the time Plaintiff and Nationwide Class Members purchased the Product.

94.     The terms of the contract include the promises and affirmations of fact made by Defendant on the Product packaging and through marketing and advertising, as described above.

95.     This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiff and Nationwide Class Members.

96.     As set forth above, Defendant purports through its advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for its intended use.

97.     Plaintiff and Nationwide Class Members performed all conditions precedent to Defendant's liability under this contract when they purchased the Product.

98.     Defendant breached express warranties about the Product and its qualities because, despite Defendant's warranties that the Product is made wholly from natural ingredients, is safe to swallow, and is absolutely free from toxic ingredients, the Product risks containing, or worse, does contain harmful, toxic PFAS chemicals.  Thus, the Product does not conform to Defendant's affirmations and promises described above.

99.     Plaintiff and each Nationwide Class Member would not have purchased the Product had they known the true nature of the Product.

100.     As a result of Defendant's breach of express warranty, Plaintiff and each Nationwide Class Member suffered and continue to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

### COUNT V
### Unjust Enrichment
### (On Behalf of the Nationwide Class)

101.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

102.     Plaintiff brings this claim under the laws of the State of California.

103.     To the extent required by this law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

104.     Plaintiff and members of the Nationwide Class conferred benefits on Defendant by purchasing the Product.

105.     Defendant was unjustly enriched in retaining the revenues derived from Plaintiff and members of the Nationwide Class's purchases of the Product.  Retention of those monies under these circumstances is unjust and inequitable because Defendant failed to disclose that the Product contained (or risked containing) toxic substances, rendering its 100% safe, non-toxic, and safe to swallow representations false and misleading.  These omissions caused injuries to Plaintiff and members of the Nationwide Class because they would not have purchased the Product if the true facts were known.

106.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and members of the Nationwide Class is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a)     For an order certifying the Classes under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Classes, and Plaintiff's Counsel as Class Counsel;

b)     For an order declaring that Defendant's conduct violates the statutes referenced herein;

c)     For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

d)     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e)     For prejudgment interest on all amounts awarded;

f)     For an order of restitution and all other forms of equitable monetary relief;

g)     For injunctive relief as pleaded or as the Court may deem proper;

h)     For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated: October 25, 2024        **BURSOR & FISHER, P.A.**

By:    */s/ L. Timothy Fisher*

L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
        jwilner@bursor.com
        jglatt@bursor.com

*Attorneys for Plaintiff*

**CLRA VENUE DECLARATION**

I, L. Timothy Fisher, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a Partner at Bursor & Fisher, P.A., counsel of record for Plaintiff. Plaintiff Watkins resides in Santa Cruz, California.  I have personal knowledge of the facts set forth in this declaration and as called as a witness, I could and would completely testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of California, as Plaintiff Watkins purchased the Product from her home while in this District.  Additionally, Defendant advertised, marketed, manufactured, distributed, and/or sold the Product at issue to Class Members in this District.

3.      I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Walnut Creek, California this, October 25, 2024.


                                        */s/ L. Timothy Fisher*
                                        L. Timothy Fisher